**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**GARETH WHYTE,**

                                    **Petitioner,**                    **09 Civ. 5196 (KMK)(LMS)**

          *- against -*                                               **REPORT AND**
                                                                      **RECOMMENDATION**

**DAWSON BROWN, Superintendent, Sing**
**Sing Correctional Facility,**

                                    **Respondent.**

**TO: THE HONORABLE KENNETH M. KARAS, U.S.D.J.**

          Petitioner Gareth Whyte, proceeding *pro se*, seeks a writ of habeas corpus pursuant to 28

U.S.C. § 2254 to challenge his conviction for assault in the first degree (N.Y. Penal Law §

120.10(2)) and assault in the second degree (N.Y. Penal Law § 120.05(1)).  See Docket # 1

(Petition).  On March 1, 2006, Petitioner was sentenced to a determinate term of imprisonment

of fifteen years and a five-year period of post-release supervision for assault in the first degree

and a determinate term of imprisonment of seven years and a three-year period of post-release

supervision for assault in the second degree.  The sentences were to run concurrently.  See S:

24.[1]

          Petitioner filed a direct appeal to the New York State Appellate Division, Second

Department.  On appeal, Petitioner made three arguments: (1) the evidence was legally

insufficient to convict Petitioner of first degree assault because there was conflicting testimony

regarding the permanency of the victim's injuries; (2) the evidence was legally insufficient to

_____

          [1]"S" refers to the March 1, 2006, sentencing minutes.

convict Petitioner of second degree assault because there was conflicting testimony regarding whether the victim sustained "serious physical injury"; and (3) the conviction should be overturned because Petitioner was not properly advised of his Miranda rights[2] before making statements to the police.  See Petition.[3]

On January 22, 2008, the Appellate Division, Second Department unanimously affirmed the conviction.  People v. Whyte, 47 A.D.3d 852 (2d Dep't 2008).  Thereafter, Petitioner filed a motion in the Appellate Division, seeking leave to appeal to the New York Court of Appeals. Respondent's Ex. 5.  On May 5, 2008, the Appellate Division denied his motion.  Respondent's Ex. 6.

Petitioner filed his Petition for writ of habeas corpus on June 3, 2009.  Docket # 1.  The Petition sets forth three grounds for habeas relief: (1) the evidence was legally insufficient to prove that the victim's injuries constituted serious and permanent disfigurement within the meaning of the first degree assault statute; (2) the evidence was legally insufficient to prove that the victim's injuries constituted serious physical injury within the meaning of the second degree assault statute; and (3) statements obtained from Petitioner by the police were triggered by questioning and were obtained in violation of his Miranda rights.  Petition at 11.

For the reasons that follow, I conclude, and I respectfully recommend that Your Honor should conclude, that the Petition should be denied in its entirety.

_____

[2]Miranda v. Arizona, 384 U.S. 436, 444-45 (1966).

[3]Petitioner's brief on direct appeal is attached to his Petition.

## BACKGROUND

### I.     The Crime

At the time of the events in question, Petitioner lived in an apartment at 14 Lafayette Avenue[4] in New Rochelle, New York, with single mother Dorothy Pritchett, her four children, and her godson.  T: 487, 490.[5]  Petitioner and Pritchett first met in March, 2004, when they were both working at Everton Auto Repairs in New Rochelle.  T: 491-92.  At the time that they met, Petitioner was living in Port Chester and had to travel to and from work, so Pritchett suggested that Petitioner stay with her and go to work from her house.  T: 492.  At some point, Petitioner moved in with Pritchett.  About six months after Petitioner moved in, their relationship began to deteriorate.  T: 496.  Pritchett asked him to leave on several occasions, but he did not move out. T: 502-03.

The day before the assault, on May 7, 2005, Petitioner and Pritchett got into an argument about a phone call that she received from another man.  T: 502.  Petitioner smacked Pritchett in the face "so hard that [she] flew into [her] daughter's bed."  T: 504-05.  She hit him back, but then he threw her on her bed, pinned her right arm behind her back, and pushed her face into the bed so that her screams were muffled, while he proceeded to hit her "pretty hard" in her back and kidney area.  T: 505-07.  Pritchett's sons came in and tried to pull Petitioner off of Pritchett, causing the bed to collapse.  T: 507-08.  At that point, Pritchett was able to get away and left the apartment for "a half an hour to an hour, just so things were calm down [sic]."  T: 509.

On May 8, 2005, Mother's Day, Petitioner and Pritchett argued on and off throughout the

---

[4]At the pre-trial Huntley hearing, the parties referred to "14 Lafayette Street," as opposed to "14 Lafayette Avenue."  See Background, Section II., infra.

[5]"T" refers to the minutes of the trial, which took place on January 3-6 and 9-12, 2006.

day.  T: 513-14, 601.  That evening, as Pritchett's son was making her a Mother's Day dinner, she

and Petitioner got into another argument, and Petitioner left and went to 79 Second Street, the

house where Bridget Parker, Pritchett's friend, lived.  T: 515.  Pritchett went to Parker's house to

ask Petitioner what he was doing there, and Petitioner screamed and yelled at her.  T: 516.

Parker had to block Petitioner from coming toward Pritchett.  T: 516, 651.  Pritchett left Parker's

house, and Petitioner left behind her, went outside, and they resumed the argument.  T: 518, 520.

Pritchett "asked him to leave, go home to his mom, go somewhere, leave [her] alone," and

Petitioner grabbed her, choked her, and started hitting her in the face.  T: 520.  Pritchett yelled

for Petitioner to get off of her, and Parker came running out.  T: 521.  Parker pulled Petitioner

off of Pritchett.  T: 522, 653.  At that point, Pritchett ran inside Parker's house and waited before

going home.  T: 523.[6]

     When Pritchett returned to her house, she found Petitioner in her bedroom talking on the

phone.  T: 535.  When she asked him what he was doing there, he said, "none of your business,

I'll leave when I'm ready" and grabbed what Pritchett thought was her food stamp benefits card

off her dresser.  T: 535-36.  Pritchett began yelling at Petitioner, who had also taken the cards

out of the cable boxes before leaving the house.  T: 536-37, 612.

     Pritchett chased after Petitioner, and the argument continued outside at the intersection of

Second Street and Jones Street, around the corner from Pritchett's apartment.  T: 537, 612.  At

that point, Petitioner was not saying anything, but Pritchett "told him to keep it, basically 'F'

you," and she started to walk away.  T: 537.  Petitioner grabbed her, and Pritchett thought he was

---

[6]On cross-examination, Pritchett testified that she could not remember whether she went inside Parker's house after the fight or went home, but that Petitioner went inside Parker's house. T: 605.  Parker testified that Petitioner went into her house after the fight, while Pritchett returned home.  T: 653-54.

going to hug or kiss her, but instead he bit into her cheek.  T: 537-38.  Pritchett heard her "skin

ripping," and it "sounded like when you break spaghetti noodles."  T: 537.  Then, she "felt

something warm down [her] face and [she] felt burning."  Id.  When Petitioner was biting

Pritchett, she tried to get out the pocket knife that she had in her pants pocket, but it was stuck.

T: 539, 541.  After Petitioner bit Pritchett, he "looked at [her] dead into [her] face like he was

saying 'F' you and he spit the flesh at [her].  It bounce[d] off of [her]."  T: 543, 624.

Pritchett then started screaming and ran to the pay phone across the street and dialed 911.

T: 543-44.  Pritchett asked the 911 operator for help and then Petitioner came to the phone and

hung it up, saying he was sorry and was going to get Pritchett help.  T: 544.  Pritchett then ran to

Bridget Parker's house.  T: 547, 656.  Parker told her brother to call 911.  T: 658.  Petitioner then

entered Parker's house and said "what did I do, what did I do, I'm sorry, what did I do."  T: 659.

Parker told him "to get out, because [she was] calling the cops, you're going to jail," and she told

her sister to call back 911 since no one had arrived yet.  Id.  Then Parker called the police again

and pushed Petitioner out the door.  T: 659-60.

Both police and paramedics arrived at Parker's house, the paramedics wrapped Pritchett's

head in gauze and brought Pritchett to Sound Shore Medical Center.  T: 463-64, 547-49, 660-61,

1022-23.  When Pritchett arrived at the hospital at 11:34 p.m., she told the emergency room

physician, Dr. Richard Smith, that she had been bitten in the face.  T: 785-86.  When he

examined Pritchett, Dr. Smith found an "open lesion on the left side of the face by the eye but

not involved in the eye itself with loss of tissue."  T: 787.  Dr. Smith testified at trial that

Pritchett's wound was consistent with a human bite.  T: 793-94.  He said that with a human bite,

he would administer intravenous antibiotics and clean the wound to avoid infection.  T: 795.

Because he could not repair the wound himself, Dr. Smith consulted plastic surgeon, Dr. Andrew

5

Kleinman, who told him that the best course of action was to clean and bandage the wound and that a procedure to repair the injury would be done at a future date.  T: 695, 795.  After a couple of hours in the hospital, Pritchett left with her wound covered in a bandage.  T: 549-50.  She returned home around 3 o'clock in the morning.  T: 552.

In the days after the assault, Pritchett's face felt sore, "like there was something missing," like she "had a hole in [her] face," T: 576, and she could not lie down on it, she could not sleep, she had to sleep sitting up, and she "had to take pain killers just to numb it."  Id.  Pritchett could not open her mouth wide enough to eat anything.  Id.  The vision in her left eye was limited.  Id.  She could not rest because she was having nightmares.  Id.

Three days after the assault, on May 12, 2005, Pritchett went to see Dr. Kleinman.  T: 574-75, 699.  In describing Pritchett's wound, Dr. Kleinman noted that missing from the left side of her face was the thin layer of fat that is under the skin and little bits of the muscle.  T: 703-04.  Dr. Kleinman explained that the sensory nerves in the skin had been cut and some had even been removed, as a result of which "the areas of skin that those sensory nerves then travel to, those become numb and they can remain numb permanently.  In addition to that, where the nerves are cut, you actually form a little scar on the nerve . . . ."  T: 705.  In addition, Dr. Kleinman testified at trial regarding the injury to Pritchett's eye, explaining that "even with the ideal result from surgery," a person could get "atosis of the lower eyelid, . . . where the lower eyelid pulls down and pulls away from the eye, so when you try to close your eye you can't completely close it.  And typically at night with an injury like this people very often don't close it, and therefore you need to try to do additional surgical procedures to correct that, because otherwise you can have a problem with the eye."  T: 706.

About a week after the incident, Dr. Kleinman performed surgery on Pritchett's face.  T:

579. Dr. Kleinman performed a "flap procedure" in which "instead of just taking two ends of a wound and closing it [he] actually rearranged the tissue." T: 709. Pritchett testified at trial that after the operation, she felt better that the wound was closed, but she still had a lot of pain. T: 580. Pritchett's eye drooped, and she still had problems seeing, she could not control her eye, and she could not wink or blink. Id. Pritchett testified that as a result of her injuries, she could not be in the cold or the heat for too long because her face hurts, it tightens up, her vision "comes and goes," and she could not do her job anymore because when she sat at the computer, she lost vision in her left eye. Id. Pritchett stated that she no longer had any feeling on the left side of her face. Id. She could not lie down on that side of her face because it hurt, and it would swell up. T: 590. She could not put things in her mouth on that side of her face. T: 591. Pritchett testified that she was also receiving treatment from an ophthalmologist, who was checking the nerves in her eye. Id. She stated that she and Dr. Kleinman were waiting to see if she needed other surgeries. Id.

Dr. Kleinman testified at trial that the scar had become more visible over time; it "ha[d] spread and become somewhat darker." T: 732. He testified that he would never be able to eliminate the scarring to Pritchett's face. T: 710. Dr. Kleinman also testified that numbness and a burning sensation in the left cheek area would be expected outcomes of an injury such as this. Id. He said that the burning resulted from the fact that multiple sensory nerves were cut and were "sitting as raw nerve ends." Id. Dr. Kleinman testified that because there was "significant skin loss," he "would not be surprised if at night she doesn't have a situation where she really does not a hundred percent close her eyes and can get all sorts of . . . problems with the eye." T: 711. Of the over 100 bite wounds that Dr. Kleinman had treated, Pritchett's wound, "[i]n terms of the size, nature and location" was "probably the worst one." Id.

7

With respect to Pritchett's prognosis, Dr. Kleinman testified,

> There is still a significant chance with time, with aging, with scarring, that she could have a problem with that lower eyelid.  I'm never going to be . . . totally comfortable that that's not going to be an issue in the future.  So I think . . . there is a significant chance that she will need to have, at some point in the future, a procedure in order to protect the eye.
> In addition to that there is a pretty significant scar and . . . we don't have any techniques to eliminate scars.  The question will be as it heals – and usually I wait a year or longer to see how the scar . . . is – at that point we consider whether or not other procedures should be done to try to improve the appearance of it. . . .

T: 715; see also T: 735.

At the sentencing on March 1, 2006, the prosecution noted that Pritchett had consulted with Dr. Kleinman a few days prior to the sentencing, and she was going to be scheduled for another surgery.  S: 6.

## II.   The Huntley Hearing

Prior to the trial, a Huntley hearing[7] was held in connection with Petitioner's motion to suppress statements that he made to police at the time of his arrest.  The only witnesses who testified at the hearing were Police Officer Rafael Rivera and Lieutenant George Marshall, both of whom worked for the New Rochelle Police Department.

Officer Rivera was working the midnight tour of the uniform patrol on the night of May 9, 2005.  H: 8.[8]  Following roll call at 11:45 p.m., he was sent to the Emergency Room at Sound Shore Medical Center to meet another police officer, Officer Ferguson, who was talking to an assault victim.  H: 8-10.  Officer Ferguson was in the Emergency Room with the victim, Dorothy

---

[7]People v. Huntley, 15 N.Y.2d 72 (1965).

[8]"H" refers to the minutes of the Huntley hearing, which took place on December 9, 2005.

Pritchett, her son, and the medical staff.  H: 9.  Officer Ferguson told Officer Rivera that he was

taking a report for an assault that had taken place at 14 Lafayette Street for which a man by the

name of "Gary White" was wanted.  H: 10.

At around 3:25 a.m., Officer Rivera received a 911 dispatch call instructing him to go to

14 Lafayette Street with regard to a suspicious person.  H: 11.  When he arrived at 14 Lafayette

Street, he rang the doorbell and was met at the door by Pritchett's son, who told him that

Petitioner "ran to the back."  H: 11-12.  Officer Rivera then went to the back of 14 Lafayette

Street, which was also known as 21 Third Street, where there was a small parking area between

two houses.  H: 12.  He took out his flashlight and started looking in between vehicles.  H: 13.

When he got to the last row, Officer Rivera saw a male lying on his stomach on the ground

between two vehicles.  Id.  Officer Rivera drew his firearm and ordered the suspect to stand up.

Id.  When Officer Rivera asked the man if he was Gareth Whyte, he said yes.  Id.  Officer Rivera

ordered Petitioner to move forward toward the sidewalk, toward Officer Rivera, at which point

he could see that Petitioner did not have a weapon.  H: 14.  Officer Rivera then lowered his

weapon and directed Petitioner with his hand, and right before Petitioner got to the sidewalk, he

said, "I just came to apologize to my girlfriend."  Id.

At that point, Officer Rivera brought Petitioner to the sidewalk, gave him a quick pat

down to check for weapons, and told him that he was being placed under arrest for an assault

that had occurred earlier that evening.  H: 14-15.  Officer Rivera placed handcuffs on Petitioner,

and as he did so, Petitioner repeated, "I just came to apologize to my girlfriend.  I just came to

apologize to my girlfriend."  H: 16.  At that point, Sergeant Brady, Officer Rivera's supervisor,

who was on the scene, said, "Stop, make sure he's read his rights," so Officer Rivera verbally

gave Petitioner Miranda warnings.  Id.  After administering Miranda warnings, Officer Rivera

9

asked Petitioner if he understood them, and Petitioner said yes.  Id.  During this time, Petitioner

was calm and compliant.  Id.[9]

        After Officer Rivera administered the Miranda warnings, he and Petitioner began

walking northbound on Third Street toward Lafayette, at which time, Petitioner started saying,

"She wouldn't let me go see my mother."  H: 17.  Officer Rivera then stopped Petitioner and told

him, "Mr. Whyte, you have the right to remain silent.  You don't have to make any statements to

us," and Petitioner responded, "Yeah, yeah, I just want to tell you what happened."  Id.  At that

point, Officer Rivera said, "Okay, if you want to tell me," and Petitioner told him that he

"wanted to go see his mother.  She wouldn't let me go to my mother's house.  We got into an

argument.  She pulled out a knife on me.  I grabbed her hand, she bit me on my finger and I

flipped out and bit her on the face."  H: 17-18.

        When Officer Rivera and Petitioner reached the corner of Third and Lafayette Streets,

Pritchett's son was there, and Petitioner said to him, "Tell your mother, I'm sorry, I just flipped

out."  H: 18.  Officer Rivera and Petitioner then turned the corner, at which point Sergeant Brady

began speaking to Officer Rivera's tour commander, Lieutenant Marshall.  Id.  Lieutenant

Marshall approached and asked Petitioner if he knew where the piece of skin was.  H: 19.

Petitioner said he did and agreed to show the police where it was.  Id.  They crossed the street to

Second Street, at which point Petitioner stated, "This is the spot where we got into the argument.

She pulled out a knife on me, we had a struggle, I grabbed her hand.  She bit me on the finger.  I

then bit her on the face.  I flipped out and bit her on the face and then I ran around the corner,

---

[9]Officer Rivera later elaborated, "When I first encountered Mr. Whyte and I directed him
out from hiding, he was compliant.  After being placed under arrest and read his rights he
seemed a little bit anxious and talkative.  After taking him around the corner when we were
doing the step by step of the incident, he then was a bit more calm."  H: 25.

spit it out and then I left." Id.  When Officer Rivera was walking with Petitioner, he was not

asking Petitioner any questions, but Lieutenant Marshall was asking Petitioner some questions.

H: 19-20.  After Petitioner's description of the confrontation on Second Street, Lieutenant

Marshall asked him what he did with the skin, and Petitioner replied, "I kept it in my mouth and

I ran around the corner where I spit it out." H: 20.  Petitioner then directed the police around the

corner onto Jones Street, and in front of 27 Jones Street, Petitioner motioned to the piece of skin

on the ground.  Id.  At that time, Petitioner was taken to New Rochelle Police Department

headquarters by another officer, while Officer Rivera remained on the scene and took

photographs of the skin and preserved it for evidence.  H: 20-21.

When Officer Rivera returned to the police station, he began processing Petitioner.  H:

21.  At that point, he re-administered Miranda warnings and asked Petitioner if he wanted to give

a statement, but Petitioner said he did not want to.  Id.

Officer Rivera testified that on the scene, Petitioner never asked for an attorney; never

refused to speak to Officer Rivera or any other officer; never asked to speak to anyone other than

an attorney; followed Officer Rivera's orders; and did not resist at all.  H: 25.  Officer Rivera

also testified that after administering the Miranda warnings, he did not ask Petitioner any

questions.  H: 39.  Rather, Petitioner spoke to him.  H: 38, 40-42.

Officer Rivera explained at the hearing that he made a "typographical error" in his report

when he wrote that Petitioner was hiding at 21 Fourth Street and that it should read 21 Third

Street.  H: 21, 27.  Officer Rivera testified that when he checked the report right after preparing

it, he noticed the error, but he could not correct it because it was not saved on the computer, so

he would have had to retype the entire report, and the computer was already shut off.  H: 28-29.

Officer Rivera said that he was not too concerned about the error because he wrote Third Street

on the <u>Miranda</u> warning card.  H: 29.  He explained that he made corrections to the <u>Miranda</u>

warning card, that originally he had written 24 Fourth Street,[10] because that is what he had

written in his memo book, but that he corrected it when he got back to police headquarters.  H:

30-35.

      Lieutenant Marshall was the tour commander of the midnight tour and was working the

night of May 9, 2005.  H: 53-54.  When he came on duty, he was informed that an assault had

taken place in which a woman had been bitten and that the suspect was at large.  H: 54.  He was

told the suspect's name was Gareth Whyte.  <u>Id.</u>  Later on in the tour, he responded to a call of a

suspicious person on Third Street by Lafayette.  H: 55.  When he arrived on the scene, he saw

Officer Rivera as well as some other officers.  <u>Id.</u>  He saw Officer Rivera walking on Third

Street toward Lafayette with Petitioner.  H: 56.  Petitioner was in handcuffs and was being

walked to a radio car.  <u>Id.</u>  Lieutenant Marshall spoke to Sergeant Brady and asked whether

Petitioner was advised of his <u>Miranda</u> rights and was told that he had been.  H: 56-57, 62-63.

Then, Lieutenant Marshall asked Petitioner if he would show the police officers where the skin

was.  H: 57.  Petitioner responded and agreed to show them where it was.  <u>Id.</u>  At the time that

Lieutenant Marshall asked Petitioner this question, Petitioner appeared calm and seemed to be

aware of what was going on.  <u>Id.</u>  Petitioner then agreed to walk with the police and show them

where he had left the piece of flesh.  H: 58.

      They walked on Lafayette toward Second and turned the corner; at that point, Petitioner

stopped and explained that that was where the assault had occurred.  <u>Id.</u>  According to Lieutenant

Marshall, this was in response to a question from Officer Rivera as to what had happened.  <u>Id.</u>

---

    [10]When presented with his memo book at the hearing, however, Officer Rivera testified
that in it he wrote "21 Fourth Street."  H: 33.

They then walked across the street to Jones and walked three or four houses down the block, at which point Petitioner motioned to the ground and told them that was where the skin was.  H: 58-59.  While they were walking, Lieutenant Marshall had asked Petitioner what he did with the skin after he bit Pritchett, and Petitioner said that he kept it in his mouth until he got to Jones, where he spit it out.  H: 59.  As Petitioner and the police officers were walking, Petitioner told them about the assault:  he said that "the dispute was over the fact that he wanted to go to his mother's and his girlfriend wouldn't let him"; he said that "she had pulled out a knife and he bit her to defend himself.  He grabbed a knife.  She bit him and then he bit her."  H: 60.  Lieutenant Marshall then told Sergeant Brady to have somebody call the hospital to see if the skin had some medical value and to have somebody come and photograph it.  Id.

Lieutenant Marshall testified that throughout the time he was with him, Petitioner was calm and aware of what was going on, and that Petitioner never asked to speak to an attorney; he never refused to speak to Lieutenant Marshall; he never resisted physically; and he never asked to speak to anyone other than an attorney.  H: 61.

## DISCUSSION

### I.   Standard of Review

"Habeas review is an extraordinary remedy."  Bousley v. United States, 523 U.S. 614, 621 (1998) (citing Reed v. Farley, 512 U.S. 339, 354 (1994)).  To be granted a writ of habeas corpus from a federal district court, a petitioner must fully and carefully comply with the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  Under the AEDPA, all state remedies must be exhausted before a federal court may consider a state prisoner's petition for a writ of habeas corpus.  28 U.S.C. § 2254(b)(1)(A); see also Picard v. Connor, 404 U.S. 270, 275 (1971).  In the interests of comity and expeditious

federal review, "[s]tates should have the first opportunity to address and correct alleged

violations of [a] state prisoner's federal rights." See Coleman v. Thompson, 501 U.S. 722, 731

(1991); see also Daye v. Attorney Gen. of the State of New York, 696 F.2d 186, 190-91 (2d Cir.

1982).  The exhaustion requirement of the federal habeas corpus statute is set forth in 28 U.S.C.

§ 2254(b)(1), (c):

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted unless it appears that–
>
>> (A) the applicant has exhausted the remedies available in the courts of the
>> State; or
>>
>> (B)(i) there is an absence of available State corrective process; or
>>
>>> (ii) circumstances exist that render such process ineffective to protect
>>> the rights of the applicant.  . . .
>
> (c) An applicant shall not be deemed to have exhausted the remedies available in the
> courts of the State, within the meaning of this section, if he has the right under the
> law of the State to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b)(1), (c).

The Second Circuit has adopted a two-stage inquiry to determine whether the exhaustion

doctrine has been satisfied.  See Klein v. Harris, 667 F.2d 274, 282 (2d Cir. 1981).  First, the

petitioner must have "fairly presented" his or her federal constitutional claim to the appropriate

state courts.  Picard v. Connor, 404 U.S. at 275-76.  "A claim has been 'fairly presented' if the

state courts are apprised of 'both the factual and the legal premises of the claim [the petitioner]

asserts in federal court.' "  Jones v. Vacco, 126 F.3d 408, 413 (2d Cir. 1997) (quoting Daye, 696

F.2d at 191).  In other words, the claim must have been presented in a way that is "likely to alert

the court to [its] federal nature."  Daye, 696 F.2d at 192.  The fair presentation requirement is

satisfied if the state court brief contains phrases, such as "under the Due Process Clause" or

14

"under the Constitution," that point to the petitioner's reliance on the United States Constitution as his or her legal basis for relief.  Klein, 667 F.2d at 282 (internal citations omitted).  A claim may be considered "presented" even if the federal grounds were not explicitly asserted before the state courts if the petitioner, in asserting his or her claim before the state court, did one of the following: (1) relied on pertinent federal cases that employ constitutional analysis, (2) relied on pertinent state cases that apply constitutional analysis in like fact situations, (3) asserted his or her claim in terms so particular as to call to mind specific constitutionally-protected rights; or (4) alleged a fact pattern that falls within the mainstream of constitutional litigation.  See Daye, 696 F.2d at 186; Irving v. Reid, 624 F. Supp. 787, 789 (S.D.N.Y. 1985).

Second, having fairly presented his or her federal constitutional claim to the appropriate state court and having been denied relief, the petitioner must appeal his or her conviction to the highest state court.  Klein, 667 F.2d at 282.  Where a petitioner fails to present his or her federal constitutional claim to the highest state court, the claim cannot be considered exhausted.  Id. (citing Williams v. Greco, 442 F. Supp. 831, 833 (S.D.N.Y. 1977)).  There is, however, another avenue available for exhaustion purposes.  A petitioner who has failed to exhaust state remedies by pursuing a direct appeal may satisfy the exhaustion requirement by utilizing available state methods for collaterally attacking his or her state conviction.  See Klein, 667 F.2d at 282; see also Johnson v. Metz, 609 F.2d 1052, 1055-56 (2d Cir. 1979) (instructing habeas petitioner who did not fairly present claim in the course of his direct appeals in New York state courts to proceed by filing a motion to vacate judgment pursuant to N.Y. Crim. Proc. Law § 440.10).  If collateral relief is denied, the petitioner may satisfy the exhaustion requirement by employing the state appellate procedures available for review of such denial.  Klein, 667 F.2d at 282-83.

"In all cases in which a state prisoner has defaulted his federal claims in state court

15

pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750.

Generally, a state prisoner has one year from the date his or her conviction becomes final to file a habeas petition in federal court. 28 U.S.C. § 2244(d)(1). This limitations period ordinarily begins to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). The limitations period is tolled while ". . . a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending . . . ." 28 U.S.C. § 2244(d)(2). The limitations period may also be equitably tolled if a petitioner can show that "extraordinary circumstances prevented him [or her] from filing his [or her] petition on time." Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000). After a petitioner has met these threshold requirements, a federal district court generally may hear "an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court" only if the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

When a state court has decided a claim on the merits, the federal court must apply AEDPA's deferential standard of review. See Torres v. Berbary, 340 F.3d 63, 68 (2d Cir. 2003). Under AEDPA, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

16

established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established Supreme Court precedent "if 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.' "  Torres, 340 F.3d at 68 (quoting Williams v. Taylor, 529 U.S. 362, 412-13 (2000)).

"[A]n unreasonable application of clearly established Supreme Court precedent occurs when a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Torres, 340 F.3d at 68 (internal quotation marks and citation omitted).  While "it is clear that the question is whether the state court's application of clearly established federal law was objectively unreasonable, the precise method for distinguishing objectively unreasonable decisions from merely erroneous ones is less clear.  However, it is well-established in [the Second Circuit] that the objectively unreasonable standard of § 2254(d)(1) means that petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief."  Id. at 68-69 (internal quotation marks and citations omitted).

Under the second prong of § 2254(d), the factual findings of state courts are presumed to be correct.  Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997).  The petitioner must rebut this presumption by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

17

II.    **Petitioner's Claims for Habeas Relief**

A.    **Legal Sufficiency of the Evidence**

Grounds A and B in the Petition both present challenges to the legal sufficiency of the

evidence of Petitioner's guilt.  In Ground A, Petitioner claims that Pritchett's injuries did not

constitute serious and permanent disfigurement within the meaning of the first degree assault

statute, and in Ground B, Petitioner claims that Pritchett's injuries did not constitute serious

physical injury within the meaning of the second degree assault statute.  See Petition at 11.  Both

of these claims were raised by Petitioner on direct appeal, and the Appellate Division held,

> Viewing the evidence in the light most favorable to the prosecution
> (see People v Contes, 60 NY2d 620, 621 [1983]), we find that it was
> legally sufficient to prove, beyond a reasonable doubt, that the defendant
> was guilty of assault in the first degree (see Penal Law § 120.10 [2]).  The
> evidence established that the defendant bit off a mass of the victim's cheek
> near her left eye, causing permanent scarring, numbness, pain, and partial
> vision impairment, and which condition, even after what a plastic surgeon
> characterized as "successful" surgery, may require additional procedures
> both to protect the victim's eye and to improve the appearance of her
> scarring.  Thus, the People proved serious and permanent disfigurement
> sufficient to support the defendant's conviction of assault in the first
> degree (see Penal Law § 120.10 [2]; see also People v Lausane, 16 AD3d
> 523 [2005]; People v Rivera, 268 AD2d 538, 539 [2000]; People v
> Martinez, 257 AD2d 667 [1999]; People v Gadson, 190 AD2d 860, 861
> [1993]; People v Wade, 187 AD2d 687 [1992]).  The evidence also was
> legally sufficient to prove, beyond a reasonable doubt, that the defendant
> was guilty of assault in the second degree, as he caused the victim to
> suffer serious and protracted disfigurement (see Penal Law § 10.00 [10]; §
> 120.05 [1]).  Moreover, upon the exercise of our factual review power (see
> CPL 470.15 [5]), we are satisfied that the verdict of guilt was not against
> the weight of the evidence (see People v Romero, 7 NY3d 633, 644-645
> [2006]).

People v. Whyte, 47 A.D.3d 852, 853-54 (2d Dep't 2008).  In his habeas petition, Petitioner

contends that the Second Department's decision regarding the legal sufficiency of the evidence

"was based on an unreasonable determination of the facts in light of the evidence presented in

State Court Proceeding [sic]."  Petition ¶ 44.

Petitioner's application for leave to appeal to the New York Court of Appeals stated that he sought permission to appeal based upon "the question of sufficiency of evidence," in addition to the "issue of exclusion of evidence."  Respondent's Ex. 5 (Affirmation in Support) ¶ 5. However, after arguing that Petitioner had not been properly advised of his Miranda rights, id. ¶ 6, the application stated, "There are additional legal questions for review by the Court of Appeals, including whether the People demonstrated a level of injury sufficient to meet the elements of first degree assault."  Id. ¶ 7.  Thus, as Respondent points out, the application for leave to appeal failed to raise the issue of whether the evidence was sufficient to prove "serious physical injury" as required to establish second degree assault.  In light of Petitioner's failure to present the claim asserted as Ground B of his Petition in his application for leave to appeal to the Court of Appeals, such claim is unexhausted and procedurally defaulted and is barred from federal review in this habeas proceeding.  See O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999); Smith v. Duncan, 411 F.3d 340, 345 (2d Cir. 2005) (even if the original Appellate Division briefs are submitted along with the leave application, an issue is procedurally defaulted if it is not presented to the New York Court of Appeals in the application itself); Jordan v. LeFevre, 206 F.3d 196, 198-99 (2d Cir. 2000) ("[A]rguing one claim in his letter while attaching an appellate brief without explicitly alerting the state court to each claim raised does not fairly present such claims for purposes of the exhaustion requirement underlying federal habeas jurisdiction.  Petitioner's counsel has the obligation to set out these arguments.  Counsel may not transfer to the state courts the duty to comb through an applicant's appellate brief to seek and find arguments not expressly pointed out in the application for leave.").

Nevertheless, Respondent argues that neither Ground A nor Ground B provide a basis for

19

habeas relief since the state court decision rejecting Petitioner's insufficiency of the evidence claim was neither contrary to, nor an unreasonable application of, clearly established federal law, and the factual determinations of the jury, the trial court, and the appellate court are all entitled to the presumption of correctness afforded by AEDPA.  Respondent's Mem. of Law (Docket # 5) at 18-22.

"[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he [or she] is charged."  Jackson v. Virginia, 443 U.S. 307, 315 (1979) (internal quotation marks and citation omitted).  On habeas review of a claim of legally insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319 (emphasis in original) (citation omitted).  A petitioner "bears a very heavy burden in convincing a federal habeas court to grant a petition on the grounds of insufficiency of the evidence."  Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 811 (2d Cir. 2000) (citation omitted).  Moreover, "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; we defer to the jury's assessments of both of these issues."  Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) (citations omitted); see also Jackson v. Heath, No. 10 Civ. 3449, 2010 WL 3075557, at *14 (S.D.N.Y. Aug. 6, 2010)[11] ("The law is well established that questions of witness credibility are jury questions and a federal habeas court may not reassess the jury's finding of credibility:  federal habeas courts are not free to reassess

---

[11]In the spirit of Local Civil Rule 7.1(c), copies of the opinions with only WestLaw cites are attached to the copy of this Report and Recommendation which is sent to Petitioner.

the fact specific credibility judgments by juries or to weigh conflicting testimony.  On collateral review this Court must presume that the jury resolved any questions of credibility in favor of the prosecution.") (internal quotation marks, alteration, and citations omitted).  Lastly, "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction." United States v. Danzey, 594 F.2d 905, 916 (2d Cir. 1979) (citations omitted).

"When it considers the sufficiency of the evidence of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.' " Fama, 235 F.3d at 811 (quoting Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir.1999)); see also Jackson v. Virginia, 443 U.S. at 324 n.16 ("the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law").  Pursuant to N.Y. Penal Law § 120.10(2), "A person is guilty of assault in the first degree when: . . . [w]ith intent to disfigure another person seriously and permanently, . . . he [or she] causes such injury to such person . . . "  Pursuant to N.Y. Penal Law § 120.05(1), "A person is guilty of assault in the second degree when: . . . [w]ith intent to cause serious physical injury to another person, he [or she] causes such injury to such person . . ."  N.Y. Penal Law § 10.00(10) defines "serious physical injury" as "physical injury . . . which causes . . . serious and protracted disfigurement . . ."  Viewing the evidence in the light most favorable to the prosecution, a rational jury could have found beyond a reasonable doubt that Petitioner seriously and permanently disfigured Pritchett, as well as caused her serious physical injury, in the form of serious and protracted disfigurement, when he bit her left cheek.

At trial, eight months after the assault, the jury was able to see the scarring along the left side of Pritchett's face.  T: 580-81, 591-93.  Pritchett testified to the continuing nature of her injuries:  after the operation, she still had a lot of pain; her eye drooped, and she still had problems seeing; she could not control her eye; she could not wink or blink; she could not be in

21

the cold or the heat for too long because her face hurt and tightened up; because of problems

with her vision, she could no longer do her job because when she sat at the computer, she lost

vision in her left eye; and she no longer had any feeling on the left side of her face.  T: 580.

Pritchett further testified that as a result of her injuries, she could not lie on the left side of her

face because it hurt, and it would swell up.  T: 590.  She could not put things in her mouth on

that side of her face.  T: 591.  Pritchett testified that she was also receiving treatment from an

ophthalmologist, who was checking the nerves in her eye.  Id.  She and Dr. Kleinman, her plastic

surgeon, were waiting to see if she needed other surgeries.  Id.

Dr. Kleinman also testified at the trial regarding the extent of Pritchett's injuries.  He

testified that the scar had become more visible over time; it "ha[d] spread and become somewhat

darker," T: 732, and he stated that he would never be able to eliminate the scarring to Pritchett's

face.  T: 710.  Dr. Kleinman also testified that numbness and a burning sensation in the left

cheek area would be expected outcomes of an injury such as this.  Id.  He said that the burning

resulted from the fact that multiple sensory nerves were cut and were "sitting as raw nerve ends,"

id., and he also explained that in areas where sensory nerves are cut and even removed, as in

Pritchett's case, "the areas of skin that those sensory nerves then travel to, those become numb

and they can remain numb permanently.  In addition to that, where the nerves are cut, you

actually form a little scar on the nerve . . . ."  T: 705.  Dr. Kleinman testified that because there

was "significant skin loss," he "would not be surprised if at night she doesn't have a situation

where she really does not a hundred percent close her eyes and can get all sorts of . . . problems

with the eye."  T: 711.  He noted that "[t]here is still a significant chance with time, with aging,

with scarring, that [Pritchett] could have a problem with that lower eyelid," and "there is a

significant chance that she will need to have, at some point in the future, a procedure in order to

protect the eye." T: 715. Dr. Kleinman further noted that "there is a pretty significant scar and . . . we don't have any techniques to eliminate scars"; he would wait to see how the scar healed, but it was possible that Pritchett would need further surgery in the future. T: 715, 735.

On direct appeal, Petitioner based his challenge to the legal sufficiency of the evidence on the contention that there was conflicting testimony at trial regarding whether Pritchett suffered serious and permanent disfigurement, as required to convict him of first degree assault, or serious physical injury, as required to convict him of second degree assault. However, witness credibility determinations fall within the province of the jury and are not open to reassessment by the court in a federal habeas proceeding. Maldonado v. Scully, supra; Jackson v. Heath, supra. The doctor's testimony about Pritchett's injury was more than enough, if believed by the jury, to support the verdict. Accordingly, Petitioner has failed to carry his "heavy burden" of demonstrating that he is entitled to habeas relief based on the legal insufficiency of the evidence supporting his conviction.

### B.   Violation of Miranda Rights

In Ground C of his Petition, Petitioner claims that statements obtained from him by the police were triggered by questioning and were obtained in violation of his Miranda rights. Following a pre-trial Huntley hearing, the state court denied Petitioner's motion to suppress statements that he made to police at the time of his arrest. The judge concluded that Petitioner's initial statement to the police occurred before he was in custody and was admissible; that his second statement to the police, made after he was placed in custody but before Miranda warnings were given, was made spontaneously and was admissible; and that his statements made after Miranda warnings were given but in the absence of interrogation were spontaneous and thus admissible. T: 6-7. The judge noted that when, after Miranda warnings had been

23

administered orally by Officer Rivera, Lieutenant Marshall arrived and asked Petitioner to show

the police officers where the piece of Pritchett's skin was located, Petitioner agreed to do so.  T:

5.  The judge further noted that Petitioner was "calm and aware of the circumstances around

him."  T: 6.  On direct appeal, Petitioner argued that it could not be shown that he was properly

advised of his Miranda rights because (1) his statement to Officer Rivera, as recounted by

Officer Rivera at trial, was inconsistent with Pritchett's statement of what had occurred, thereby

demonstrating the unreliability of Officer Rivera's "rendition of [Petitioner's] alleged statements

and admissions," as well as the unreliability of Officer Rivera's report of the incident, "including

his account of when and where he advised [Petitioner] of his Miranda rights," Brief of

Defendant-Appellant at 33-34; and (2) as Officer Rivera testified at trial, at first he incorrectly

recorded the location at which he administered the Miranda warnings, only subsequently

correcting his error, thereby raising the question of whether Petitioner was ever given Miranda

warnings or whether he "could have made a statement either before he was read his rights, or

that statements were made before and after he was read his rights."  Id. at 34.

   In its decision, the Appellate Division held,

>    The Supreme Court properly denied that branch of the defendant's
> omnibus motion which was to suppress his statements to law enforcement
> officials.  The credibility determinations of the Supreme Court following a
> suppression hearing are entitled to great deference on appeal and will not
> be disturbed unless clearly unsupported by the record (see People v
> Baliukonis, 35 AD3d 626, 627 [2006]).  Here, the defendant's initial
> statement was made prior to his arrest and he was not in custody at the
> time.  Therefore, Miranda warnings (see Miranda v Arizona, 384 US 436
> [1966]) were not required at this point (see People v Daniels, 35 AD3d
> 756, 757 [2006]; People v Bongarzone-Suarrcy, 13 AD3d 385, 386
> [2004]; People v Beckwith, 303 AD2d 594, 595 [2003]).  The Supreme
> Court properly found that the defendant's spontaneous statements, made
> after a police officer arrested him but before Miranda warnings were
> administered, were not triggered by any police questioning or other
> conduct which reasonably could have been expected to elicit a declaration

from him (see People v Baliukonis, 35 AD3d at 627).  The Supreme Court also properly determined that the defendant's statements after the Miranda warnings were administered were voluntarily made after he knowingly and intelligently waived his Miranda rights (see People v Baliukonis, 35 AD3d at 627).  Accordingly, the Supreme Court properly denied that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials. Additionally, the defendant, who did not move to reopen the suppression hearing at trial, improperly relies on trial testimony in challenging the suppression ruling on appeal (see People v Gonzalez, 55 NY2d 720, 721-722 [1981]; People v Crosby, 33 AD3d 719, 720 [2006]; People v Brown, 11 AD3d 474, 475 [2004]; People v Gold, 249 AD2d 414, 415 [1998]; People v Diaz, 194 AD2d 688, 689 [1993]).  In any event, insofar as he maintains that his statements should have been suppressed because they were inconsistent with the victim's trial testimony as to how the assault occurred, such inconsistencies presented an issue of credibility for the trier of fact to resolve (see e.g. People v Dixson, 21 AD3d 566 [2005]).

People v. Whyte, 47 A.D.3d 852, 852-53 (2d Dep't 2008).

In his Petition, Petitioner asserts two challenges to the state court decision regarding his statements to police:  (1) the Appellate Division's finding that Miranda warnings were not required prior to his initial statement to the police, because he was not then in custody, "was based on an unreasonable determination of the facts in light of the evidence presented" in the state court proceeding, Petition ¶¶ 45-46, and (2) the Appellate Division's finding that his spontaneous statements made to the police after he was arrested but before Miranda warnings were given did not result from questioning or other conduct was also "an unreasonable determination of the facts in light of the evidence presented in" the state court proceeding.  Id. ¶¶ 47-48.  Thus, Petitioner challenges the state court adjudication under the second prong of § 2254(d) – whether the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  Under this prong of § 2254(d), the factual findings of state courts are presumed to be correct, Nelson, 121 F.3d at 833, and the petitioner must rebut

this presumption by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

### 1.      The Initial Statement to the Police

Miranda warnings are required when an individual is being interrogated by police and "where there has been such a restriction on a person's freedom as to render him [or her] 'in custody.' "  Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  When it comes to determining whether a person is in custody, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Mathiason, 429 U.S. at 495).  "Two discrete inquiries are essential to the determination:  first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."  Thompson v. Keohane, 516 U.S. 99, 112 (1995) (footnote omitted); see also Berkemer v. McCarty, 468 U.S. 420, 442 (1984) ("[T]he only relevant inquiry is how a reasonable man [or woman] in the suspect's position would have understood his [or her] situation.").  The custody determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  Stansbury v. California, 511 U.S. 318, 323 (1994).

"[U]nless the facts clearly establish custody, a state court should be deemed to have made a reasonable application of clearly established Supreme Court law in concluding that custody for Miranda purposes was not shown."  Cruz v. Miller, 255 F.3d 77, 86 (2d Cir. 2001).  In this case, the factual circumstances of the statements made by Petitioner to the police were established at the Huntley hearing in state court.  The state court judge found that Petitioner was not in custody when he made his initial statement to the police and that the absence of Miranda warnings did

26

not violate his constitutional rights.  Indeed, the <u>Huntley</u> hearing testimony established that

Petitioner spontaneously spoke to Officer Rivera when he was first discovered in the parking lot

behind 14 Lafayette Street and told the officer, after identifying himself, "I just came to

apologize to my girlfriend."  H: 14; <u>see</u> <u>also</u> T: 4 ("While moving the Defendant blurted out, I

just came to apologize to my girlfriend.").  At that point, there was nothing to suggest that

Petitioner was in custody:  he was not arrested, had not been told he was a suspect, and had not

been physically restrained.  It is therefore reasonable for the state court to conclude that

Petitioner was not in custody when he made his initial statement to the police.  Petitioner has

failed to rebut the presumptively correct factual findings underpinning the state court's

determination by clear and convincing evidence, as required by AEDPA, 28 U.S.C. § 2254(e)(1),

and thus, this claim cannot provide a basis for habeas relief.[12]

### 2.   *Statements Made After Arrest But Before <u>Miranda</u> Warnings Given*

"[T]he <u>Miranda</u> safeguards come into play whenever a person in custody is subjected to

either express questioning or its functional equivalent."  <u>Rhode Island v. Innis</u>, 446 U.S. 291,

300-01 (1980).  In other words, "the term 'interrogation' under <u>Miranda</u> refers not only to express

questioning, but also to any words or actions on the part of the police (other than those normally

attendant to arrest and custody) that the police should know are reasonably likely to elicit an

incriminating response from the suspect."  <u>Id.</u> (footnotes omitted).

In this case, based on the testimony at the <u>Huntley</u> hearing, the state court concluded that

Petitioner had voluntarily made statements to Officer Rivera after he was arrested but before

---

[12]Furthermore, as noted by Respondent, the state court's finding that Petitioner's initial
statement was made spontaneously ("blurted out") provides an additional basis for concluding
that it was not obtained in violation of Petitioner's <u>Miranda</u> rights.  <u>See</u> Discussion, Section
II.B.2., <u>infra</u>.

<u>Miranda</u> warnings were given.  As noted above, this Court must give deference to the state court factual findings, and Petitioner bears the burden of rebutting these findings by clear and convincing evidence.  Petitioner has not met his burden.  Rather, the <u>Huntley</u> hearing testimony established that Petitioner spontaneously spoke to Officer Rivera after Officer Rivera told Petitioner that he was being placed under arrest and after Officer Rivera placed handcuffs on Petitioner, at which point Petitioner repeated, "I just came to apologize to my girlfriend.  I just came to apologize to my girlfriend."  H: 14-16; <u>see</u> <u>also</u> T: 4 (while being handcuffed, Petitioner "blurted out," "I just came to apologize to my girlfriend").

Accordingly, the state court's decision was not an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, and this is not a ground for habeas relief.  <u>See</u>, <u>e.g.</u>, <u>Marshall v. Artus</u>, 9:04-CV-881, 2007 WL 2406958, at *6-*7 (N.D.N.Y. Aug. 21, 2007) (denying habeas relief and finding that <u>Miranda</u> was not implicated because state court reasonably determined that petitioner initiated conversation with detective and his statements were voluntary).

### 3.   *Statements Made After <u>Miranda</u> Warnings Were Given*

In his Petition, Petitioner nowhere contests the voluntariness of the statements that he made after he was given <u>Miranda</u> warnings, nor does he claim that his waiver of <u>Miranda</u> rights was not voluntary, knowing, and intelligent.  While such arguments were not raised on direct appeal, the Second Department nonetheless concluded that the hearing court "also properly determined that the defendant's statements after the <u>Miranda</u> warnings were administered were voluntarily made after he knowingly and intelligently waived his <u>Miranda</u> rights (<u>see</u> <u>People v Baliukonis</u>, 35 AD3d at 627)."  <u>People v. Whyte</u>, 47 A.D.3d at 853.  This determination by the state court was neither contrary to, nor an unreasonable application of, clearly established federal

law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

After a defendant is advised of the Miranda warnings, "[t]he defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444. A defendant's waiver of his or her rights under Miranda must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Id. (citations omitted).

The determination of whether a confession is voluntary is decided by a "totality of the circumstances" test. Mincey v. Arizona, 437 U.S. 385, 401 (1978); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) ("In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation."). "[T]he ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination." Miller v. Fenton, 474 U.S. 104, 112 (1985). Thus, federal courts are "not bound by" a state court's finding regarding the voluntariness of a confession and are required to "make an independent evaluation of the record." Id. at 110 (quoting Mincey, 437 U.S. at 398). This requirement for independent review specifically extends to federal courts considering petitions

29

for writs of habeas corpus.  Id. at 111 (citing Davis v. North Carolina, 384 U.S. 737, 741-42 (1966)).  However, a state court's determinations of "subsidiary factual questions," which, in the context of Miranda, may include "the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the Miranda warnings," Id. at 117, are entitled to the presumption of correctness provided by AEDPA.  Id. at 112.

In Petitioner's case, the issue of the voluntariness of both Petitioner's waiver of his Miranda rights and his subsequent statements to the police was fully developed during the Huntley hearing.  The totality of the circumstances as established by the record supports the conclusion that Petitioner voluntarily made his statements to the police after he voluntarily, knowingly, and intelligently waived his Miranda rights.

Both Officer Rivera and Lieutenant Marshall testified that Petitioner was calm at the time of his arrest.  H: 16, 25, 57, 61.  They both testified that Petitioner never asked for an attorney; never refused to speak to them; never asked to speak to anyone other than an attorney; and did not put up any resistance.  H: 25, 61.  Officer Rivera testified that Petitioner was compliant and followed his orders.  H: 25.  Lieutenant Marshall testified that Petitioner was aware of what was going on.  H: 57, 61.  After Officer Rivera administered Miranda warnings, he asked Petitioner if he understood them, and Petitioner said yes.  H: 16.  When Petitioner started saying, "She wouldn't let me go see my mother," Officer Rivera stopped Petitioner and told him, "Mr. Whyte, you have the right to remain silent.  You don't have to make any statements to us," to which Petitioner responded, "Yeah, yeah, I just want to tell you what happened."  H: 17.  There is no evidence that Petitioner did not understand his rights or that he was coerced or threatened into making statements.  Rather, Petitioner made a number of statements to the police spontaneously, without questioning; he wanted to give the police his account of events, including in response to

30

the questions actually asked of him.

Accordingly, based upon an independent evaluation of the record, I respectfully recommend that Your Honor should conclude that Petitioner voluntarily waived his <u>Miranda</u> rights, and his statements were properly admissible.  Therefore, this claim does not provide a basis for habeas relief.

### 4.    *Whether <u>Miranda</u> Warnings Were Given*

While the Petition does not explicitly assert as a ground for relief that <u>Miranda</u> warnings were not properly given, Petitioner does attach to the Petition a copy of the brief he submitted on his direct appeal in which that argument was made.  Therefore, for the sake of completeness, the Court addresses it herein.

Petitioner claimed on direct appeal that it could not be shown that he was properly advised of his <u>Miranda</u> rights because (1) Officer Rivera's account at trial of what Petitioner said regarding the assault was not consistent with Pritchett's description of the assault; and (2) Officer Rivera testified at trial to making a mistake in recording the location at which he administered the <u>Miranda</u> warnings.

First, testimony at trial regarding the substance of Petitioner's statements to the police has nothing to do with the issue before the hearing court, <u>i.e.</u>, whether those statements were obtained in violation of Petitioner's <u>Miranda</u> rights.  As noted by the Second Department, Petitioner never moved at trial to reopen the suppression hearing.[13]  Moreover, trial testimony regarding the substance of Petitioner's statements to the police is completely irrelevant to the

---

[13]Notably, Petitioner does not contend that Officer Rivera's testimony at trial of how the statements were obtained from Petitioner differed from his testimony during the <u>Huntley</u> hearing.

determination in this habeas proceeding of whether the denial of the motion to suppress was either contrary to, or an unreasonable application of, clearly established federal law, or whether it was based on an unreasonable determination of the facts in light of the evidence presented <u>to the hearing court</u>.  Thus, this argument does not present a ground for habeas relief.

Second, with respect to the claim that it is questionable whether Officer Rivera properly administered <u>Miranda</u> warnings because of discrepancies in the street address noted on the police documents – 21 or 24 Fourth Street[14] – versus his testimony at trial that the <u>Miranda</u> warnings were given at 21 Third Street, T: 970-79, this claim was raised at the <u>Huntley</u> hearing by counsel for Petitioner.  There, Officer Rivera provided the same testimony regarding these discrepancies, and Petitioner's attorney argued that because of these discrepancies, Officer Rivera's testimony regarding the administration of <u>Miranda</u> warnings was not credible.  H: 68-70.  The hearing court did not agree and denied the motion to suppress.  Tr. 2-7.  The Second Department found the hearing court's credibility determinations to be supported by the record.  <u>People v. Whyte</u>, 47 A.D.3d at 852-53.  "Absent clear and convincing evidence, this Court is not permitted to re-evaluate the credibility of witnesses not before it, and has no basis here to disturb the state court's credibility determinations."  <u>Tibbs v. Greiner</u>, No. 01 Civ. 4319, 2003 WL 1878075, at *9 (S.D.N.Y. Apr. 16, 2003) (footnote and citations omitted).  Petitioner has presented no evidence, let alone clear and convincing evidence, as required by AEDPA, 28 U.S.C. § 2254(e)(1), that

---

[14]Officer Rivera testified at trial that on the report of this incident, he wrote 21 Fourth Street, which was a typographical error, T: 970; that in his note pad, he wrote 21 Fourth Street in error, T: 975-76; and that on the "Notice of Constitutional Rights" form, or <u>Miranda</u> card, he originally wrote 24 Fourth Street but then, upon reading his report back at police headquarters, noticed his error and corrected the card to say 21 Third Street, T: 976-79.

Officer Rivera likewise testified at the <u>Huntley</u> hearing that on the <u>Miranda</u> warning card, he originally wrote 24 Fourth Street, H: 30-31, and that in his memo book he had written 21 Fourth Street.  H: 33-34.

would cause this Court to re-evaluate Officer Rivera's credibility. Nor is there any basis for this Court to conclude that the hearing court's decision that Officer Rivera administered <u>Miranda</u> warnings to Petitioner was based on an unreasonable determination of the facts in light of the evidence presented at the <u>Huntley</u> hearing. 28 U.S.C. § 2254(d)(2); <u>see</u> <u>Tibbs</u>, 2003 WL 1878075, at *10 (collecting cases). Thus, this argument is likewise not a ground for habeas relief.[15]

<u>**CONCLUSION**</u>

For the reasons stated above, I conclude, and respectfully recommend that Your Honor should conclude, that the instant habeas petition should be dismissed. As the petition presents no questions of substance for review, I conclude, and respectfully recommend, that a certificate of probable cause should not issue. <u>Rodriguez v. Scully</u>, 905 F.2d 24 (2d Cir. 1990) (<u>per</u> <u>curiam</u>); <u>Alexander v. Harris</u>, 595 F.2d 87, 90-91 (2d Cir. 1979). I further conclude, and respectfully recommend, that the Court should certify pursuant to 28 U.S.C. § 1915(a) that an appeal from this order would not be taken in good faith. <u>See</u> <u>Coppedge v. United States</u>, 369 U.S. 438 (1962).

---

[15]To the extent that this claim could be construed to suggest that Petitioner was questioned prior to the administration of <u>Miranda</u> warnings, <u>see</u> Brief of Defendant-Appellant at 34 (Petitioner "could have made a statement either before he was read his rights, or [it is possible] that statements were made before and after he was read his rights."); Respondent's Ex. 5 (Affirmation in Support of Motion for Permission to Appeal to Court of Appeals) ¶ 6 ("As set forth in the brief submitted to this Court on behalf of the defendant-appellant, there was inconsistent testimony about when the defendant-appellant was read his rights. It appears from the testimony that the defendant-appellant was questioned by the police while in custody but before his rights were read to him."), such claim fails for the reasons set forth in Discussion, Section II.B.2., <u>supra</u>.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation.  Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Kenneth M. Karas at the United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Karas, and should not be made to the undersigned.

Dated: July 18, 2011
        White Plains, NY

                                    Respectfully submitted,

                                    Lisa Margaret Smith
                                    United States Magistrate Judge
                                    Southern District of New York

A copy of the foregoing Report and Recommendation has been sent to the following:

The Honorable Kenneth M. Karas, U.S.D.J.

Gareth Whyte (#06-A-1249)
Sing Sing Correctional Facility
354 Hunter Street
Ossining, NY 10562

John J. Sergi, Esq.
Westchester County District Attorney

34

111 Dr. Martin Luther King, Jr. Blvd.
White Plains, NY 10601